v. FCC case first. Counsel, we will leave you with observing time for rebuttal. I would like to, Your Honor, five minutes, if possible. Great. Thank you very much. My name is Dennis Corbett. And I am here this morning representing petitioners, Counsel Tree Communications, Bethel Native Corporation, and the Minority, Immediate, and Telecommunications Council. I would also like to thank the Court for hearing the case at this time. We have sought expeditious oral argument, and the Court accommodated that for which we are grateful. We appreciate that. In this matter before the Court, we believe strongly that the FCC did not do its job. In the rulemaking below. And as a consequence, it makes this Court's job in reviewing what they did quite difficult. It's not a normal rulemaking case in that sense because of the way the rulemaking unfolded. In order to get into the merits of the case, I'd like to talk to you this morning about two concepts that kind of bring it all together. One is the importance of predictability in this process, particularly under 309J. And the other is the importance of flexibility in the financing of auction participants. Before I get to the merits, don't you think you should address jurisdiction since it's being challenged? Certainly, I'd be happy to. We addressed the issue in our reply brief, and those responses, I think, are complete and I hope persuasive. But starting with the statutory basis, they relied basically saying we're too early. It's not we're too late, we're too early. And they relied on some D.C. Circuit precedent which involved orders of the Commission which were rendered under 405 of the Communications Act. 405 of the Communications Act contains within it an express judicial review provision which basically pegs... They use public notice as the standard. Which is 405. And this case before you right now is not 405. In fact, one of the things they failed to do is rule on our 405 motion. This was an on-their-own motion ruling that they made outside of... They didn't rule on our 405 motion. They are statutorily obligated to rule on it, but as of this moment, they have not done so. So they can't pull in the public notice provision of 405. And what we have argued in this court is that that means you fall back on the express language of 2344 which has a different timing sequence set out on the face of that statute. That talks about the judicial review being pegged to the entry of an order. That says that an agency must first enter an order and then give prompt public notice thereof in conformance with its own regulations. And then it goes on to say that we need to file a petition within 60 days of entry, not public notice. And so my contention is under the express language of 2344, we're fine. And this is not a 405 case, and the Western Union case is not brought into play because 405, they expressly relied on it. They cited that statutory scheme. So that's why we really have to get beyond the statute. But it's more than that, of course. When we came to this court for a stay in June of last year, the court made clear to the attorneys that they needed to make their own independent finding of jurisdiction. And the parties were put on notice and asked about jurisdiction. And the FCC at that point had this too early argument available to them because at that time we still hadn't filed what they would consider to be a timely petition because as of June 28th, the Federal Register publication had occurred on June 15th. And under their theory, we were too early then. But they didn't raise it then. And in my view, I mean, it was available to them. And the court asked about the issue. The court found jurisdiction under 2342 and 2344. So we now have a rule of this case, this very case. We have the full opportunity of the panel. And under the law of this circuit, when one panel has decided a matter, in this case jurisdiction, the only way you would revisit it is if there are some exceptional circumstances which are not present here. So you're saying that's the law of the case at this point. Yes. We've already made that finding. Oh, yes. And in open court, with full opportunity to address it, this argument available to them. They didn't raise it at the time. You know, that's a whole separate basis. The exceptional circumstances are, is there new evidence? Is there a supervening new law? Or would the earlier decision, the earlier decision was clearly erroneous and would create manifest injustice. My argument would be, you would create manifest injustice by not hearing this case, given the importance of these auctions, the fact that they continue to go on. If we punt this into the future, I mean, that's manifest injustice. This is the time to hear this case. Maybe you should move on to the substance. Okay. Well, that gets me back to those two buzzwords I'd like to talk about, just to help get us into the case. Predictability. This case is really, when it boils down to it, is about the congressional scheme, of course, in 309J, as well as the APA. There's a whole, a huge APA problem, in my opinion, with this case, but I want to talk about 309J and the way the commission has implemented it over the years. In 1997, prior to 1997, they would take the auctions on a case-by-case, auction-by-auction basis, and they'd sort of adopt rules for each auction as they went. And I think there were 15 of them that had taken place under that regime. But that was unwieldy and difficult. So in 1997, they adopted more universally applicable rules for auctions. One of the things they adopted at that time was the five-year unjust enrichment period, as we call it, the five-year hold rule. I don't want to get into the semantics of arguing over that. Happy to call it an unjust enrichment period if you'd like. But one thing they said when they adopted that provision was that it's very important for the small businesses who they're trying to facilitate to have predictability in that area. For these auctions, you need a lot of advance time to plan. You need to know what the rules of the road are. You need to know what the hold period's going to be, what the unjust enrichment is. Because when we go out to try to find capital, which is the hardest thing a small business has to do to participate in these auctions, the investors need to know what are the rules of the road. And so when they adopted it in 1997, they said, for predictability reasons, we're going to adopt this five years. So was it your client who asked them to change the rules? Relatively close to when the auction occurred, within a year, right? But not that rule. But we asked for a change. Yes, we did. But that was all directed to a very targeted proposal in June. The Commission didn't even get around to it until February. If they'd adopted it in June, as several of the Commissioners said, there might have been a chance to get this done. They decided to put it out under accelerated timetables in February with the June auction. Not nearly enough time to do anything. Anything, in my opinion. But consider that targeted proposal about the alliance of large incumbent wireless companies with designated entities. That was the most they could do under the statutory scheme. Because this gets me to another part of that statute. In addition, 309J 3E has two subparts to it, 1 and 2. And those two subparts really make timing very important. Congress focused on the importance of timing to these auctions. They said, before you adopt bidding rules, give notice and comment. It's a reinforcement of the APA, which they have to operate under anyway. But in the statute we're talking about, subpart 1 talks about notice and comment. Subpart 2 then says, after you issue bidding rules, make sure there's adequate time for the development of business plans. And that, over time, over the history of auctions, has been a very important provision. You have to have time to adapt. They did the opposite here. What they did was, in this incredibly telescope time frame, with only 14 days for comments and seven for replies, they put out a very targeted proposal. And then, in this incredible turnabout, they adopted rules generally applicable to all DEs. They had, in my opinion, enough time to do the targeted proposal because people were on notice. It was there from February at least. But in late April, we have what I would consider these two pianos dropped on our head as we're walking down the street from the DEs. We are then all of a sudden found, made subject to a 10-year rule. It comes out of nowhere. And it defeats the very predictability that the 5-year rule was intended to provide when it was adopted in 1997 and then applied uninterrupted for the next 10 years. So how does that happen to us on the scene of this auction? The same is true of the other rule, which gets into the heart of the business plans that you would like. If you go to an investor and you say, we have flexibility. That's the other key word. We have flexibility in this area to adapt, to change. It's a highly dynamic field. It's hard to get into. Tremendous barriers to entry because the companies you're competing with are so large. You need to have flexibility in order… Counsel, what if the rule, instead of being changed from 5 to 10 years, was changed from 5 to 1 year? Would you be complaining? Well, I don't know how it could have been under the rulemaking that was in place. I mean, the rule wasn't… It's a new rule. I mean, this was a new rulemaking, and it was changed. What if it had been changed instead of from 5 to 10 years, 5 to 1 year? Is that a problem? Well, I think it would be, from a theoretical standpoint, if the commission puts notice out about two targeted proposals, which you have to do with very limited changes, and they still revisit the general competitive bidding rules in some way. I mean… You'd be complaining about a 1-year rule? Would I be complaining? Would I be a complainant here? I doubt it. I doubt it. If I'd be here, honestly, would I be here if it was a 1-year rule? But it's just as unpredictable as a 10-year rule. So you're really complaining about the substantive effect of the 10-year rule, are you not? No, I'm not. You ask if I'd be here challenging it. I wouldn't, but somebody else would be. And if they were, I would be hard-pressed to oppose it for the same reasons I've given in this court. It's just not in my self-interest to do that. I mean, I'd like to think I'm smart enough not to do something against my self-interest. But that doesn't make it right. That doesn't make it right before this court. Anyway, the… I see my light. Is that my… Well, do you have another question? No. Okay. We'll hear you on rebuttal. All right. Thank you very much. Thank you, Your Honors. I'm Joseph Palmore for the FCC. I've given five minutes of my time to Mr. Lake on behalf of interveners who will primarily be addressing some of the consequences of Petitioner's effort to unwind the advanced wireless service auction. In brief response to what Mr. Portman said about jurisdiction, Section 405A is a generally applicable judicial review provision. And this is quite clearly laid out by then-Judge Scalia's decision for the D.C. Circuit and Western Union Telegraph. And it makes it clear that when you're talking about a petition for review from a Communications Act proceeding, that entry and public notice are one and the same. And the clock starts running upon public notice. In this case, that's publication in the Federal Register. Does the law of the case doctrine apply to this question? It doesn't because this Court did not decide this particular question, which was when did public notice happen at the stay stage. So it's open to this panel to decide. But jurisdiction was challenged, right, on that motion? No, we conceded jurisdiction under the All Rights Act. We didn't think it was necessary for the Court to reach jurisdiction under the Hobbs Act. So regardless of what the ground of jurisdiction is, we have jurisdiction? You had jurisdiction at the stay stage under the All Rights Act. You would not have jurisdiction now under the All Rights Act. There's no jurisdiction now because the Hobbs Act is the only profit basis for jurisdiction, and the petition for review is incurably premature. The time to seek review after public notice has long run, so there currently is no jurisdiction, given the State panel's prior decision that the reconsideration petition had already been denied. But I would like to turn within my limited time to some of the questions the Court will confront in the event that it decides it does have jurisdiction. Mr. Corbett talked about Section 309J, and I would hope that the Court will carefully review the provisions of Section 309J. It's a very complicated statute. It locates the Commission's auction authority squarely within its public interest authority, and then it lays out a number of very complicated and, in some places, competing factors that the Commission must consider when it's promulgating auction rules. Section 309J includes six factors, some of them with sub-factors. J-3, J-4 has six additional factors, some of them with sub-factors. And the Commission must engage in the complex balancing of all of these factors, some of which are with tension, when coming up with auction rules. I would commend to the Court Judge Ginsburg's decision for the D.C. Circuit in Fresno Mobile, which discusses the complex balancing that the Commission has to engage in when it's implementing Section 309J and talks about the line-drawing exercises that it has to implement, and that's exactly what it did here. Turning to the question of notice, I think, here, the language of the further notice of proposed rulemaking is critical. Mr. Corbett says that Council Tree had no idea that the Commission might seek to extend its gaze to material relationships between DEs and anyone other than large incumbent wireless carriers, but this contention is refuted by the plain language of the further notice. I would particularly refer the Court to paragraph 13 of the further notice, that's at Joint Appendix, page 67, where the Commission does outline Council Tree's proposal, but then it goes on to say, we therefore seek comment on the specific nature of the relationship that should trigger such a restriction. Additionally, we seek comment on whether other material relationships should be regulated, and it's cited as one possible example, relationships between DEs and entities with significant interest in communication services. That was one illustrative example. It was not exclusive. Mr. Corbett also says in his brief that Council Tree had no idea that lease or resale might be at issue here. I would refer the Court, in response to that contention, to paragraph 16 of the further notice, that's JA 68, where the Commission explicitly talks about leasing, cites a proceeding that was all about leasing, and says after footnote 38, we seek comment on what, if any, standards should be used to determine whether a spectrum leasing arrangement is a material relationship. It then goes on to say, we also seek comment on whether other arrangements should be taken into account. Other arrangements, a very broad question. If so, what arrangements should we consider? To quite an open-ended question, the Commission here is clearly considered about relationships between DEs and non-DEs. It tees up Council Tree's proposal as one possible response to that problem, but it's looking more generally at what kinds of relationships are problematic and what other entities should it be concerned about, and it's seeking comment broadly on those issues. The Council Tree proposal was the starting point of the process, not the ending point. Then on unjust enrichment, which Mr. Corbett addressed, I would refer the Court to paragraph 20 of the further notice, that's JA 70. Here the Commission notes that its existing rules require the payment of unjust enrichment when an entity that acquires its license with small business benefits, loses its eligibility for such benefits, or transfers a license to another entity that is not eligible for the same level of benefits. The Court then goes on to note that Council Tree had proposed extending, Council Tree believed there should be a uniform unjust enrichment rule that would apply to all eligibility restrictions, and it proposed extending the existing five-year rule to these new restrictions that were being talked about here. The Commission then asks, after footnote 50, We seek comment on whether, if we adopt new restrictions on the award of bidding credits to designated entities, we should adopt revisions to our unjust enrichment rules, such as those proposed by Council Tree, or in some other manner. Quite an open-ended question, that's using, again, using the Council Tree proposal as the starting point for a larger inquiry. Then, at the end of that paragraph, the Commission goes on to specifically tee up the question of what portion of the license term the unjust enrichment rules should extend to. Now, Petitioner MMTC, who's represented by Mr. Corbett today, comments in the record saying the unjust enrichment rules should be extended to the full term of the license, and it should be a 100% payback obligation. In the case of the advance... That's one commenter, right? That was one commenter. It's a petitioner. It's a petitioner. And in the case of the advance wireless service auction, the license term was 15 years. So MMTC was quite hawkish on the question of unjust enrichment. What the Commission ended up doing was really a middle-ground position between what Council Tree wanted and what MMTC wanted. Well, you know, if I could just move you ahead just a little bit, I understand you made a compelling argument regarding nullifying the auction, and that would be very disruptive. What if we were to vacate this unjust enrichment rule? What would be the harm of doing that? I mean, it certainly wouldn't have the impact of nullifying the whole auction, would it? If the court, especially you, would probably depend on how the court phrased it, but I think it would still be disruptive. I think the argument is that there was a problem with notice, so that would be the issue. Right, but the case now that we cited in our brief is quite clear that when there perhaps is a notice problem, we strenuously believe there is no notice problem here. But to the extent there is a notice problem, the proper course is to remand without avocateur, because the question is the court must look at disruption. In this case, there would be disruption because there are upcoming auctions, and it would be questioned about what rules would apply. Well, if we vacated, wouldn't the old rule apply? Unclear. The commission has said in the reconsideration order that the old rule was insufficiently protective and didn't do enough to protect against unjust enrichment. So you would vacate the current rule, but what would be left in place is a rule that the commission has already said is legally insufficient. So it's unclear what would happen. Well, on the other hand, if we say that the new rule is legally insufficient, I think you'd have as a default the old rule, right? The commission would be in a bit of a quandary as to how to proceed at that point, but I think the case law is quite clear in that there are many cases from the D.C. Circuit, from the Ninth Circuit, from other circuits that hold, even when there is a blatant notice problem, even when decision-making is arbitrary and capricious, even when the agency's reasoning is inaccurate, that if there would be disruption, if there's a very complex scheme at stake here, and if it's quite possible that the agency could adopt the same rule on remand on a proper record and giving proper notice, then the proper course is to remand without vocateur. Well, some of the cases, as I read them, say if it's easily mended, remand is fine. What your adversary is arguing is it was wrong from the start and that vacating is the appropriate remedy. That's what your adversary is saying. I guess my question is, can you describe the harm if we do decide to vacate? I've certainly not made a decision on this, but in this particular rule, if we decided to vacate, what would be the harm? I mean, I think it would still throw into question the auction that's already happened, because that auction would have taken place under rules that have been vacated. It would throw into question and it would create incredible uncertainty for auctions that are upcoming. But what would happen to the results of the auction already held? In other words, the successful bidders would remain the same? In other words, I can see people with new complaints, they say, well, if we knew that the other rule was in effect, our bid would have been different. I think some people could come forward with arguments like that, and I think that's exactly the kind of disruption that could be caused by vocateur. But it wouldn't be disruptive in the sense that, as Judge Sugaris suggests, if the auction weren't vacated, the result stayed in place. I mean, obviously vacating the auction would be an incredibly disruptive result, but I think even vacating the rules would be disruptive. It would cast doubt on the auction. Well, I don't know if you answered his question. Do you think it's possible to vacate the unjust enrichment rule without vacating the auction result itself? I think that would be like a prospective vacation of the rule, wouldn't it? I think the court would be within the court's remedial discretion to make that clear, if it was going to do that, to say it's vacated on a prospective basis only. We do not mean to abandon in any way the auction. But as you say, on the other hand, if the rule were vacated prospectively, I assume the commission would have the authority to reconsider what to do in that circumstance, right? Exactly, and I think it's quite possible the commission would end up adopting the exact same rule, and that's why vocateur is not appropriate here, and that's what the case law teaches. If Mr. Corbett convinced you that the 10-year unjust enrichment rule was forbidden by the statute, and there is no possible way the commission could ever adopt it under any record and with any degree of notice, then you would vacate. But it's clear that's not the case. This is a complex line-drawing exercise. The statute says nothing about the length of the unjust enrichment period. This is completely within the agency's discretion, and it has to balance all of these factors. And the point about the unjust enrichment period is that if a designated entity gets this incredibly valuable public benefit, which is a steep discount on a very valuable public resource, it's only sensible that it be required to pay back a bit of that benefit for all that benefit if it flips the license at a market rate or wants to flip the license at a market rate after only five years. We're talking about 15-year license terms. So this is not a very rigorous or strict rule. And it's quite clear that to the extent, and again, I would argue that there is absolutely no notice problem here at all, given Paragraph 20 of the order. But to the extent there is a notice problem, the proper course is to remand and not to vacate. I know your time is run, but if Judge Shigeru could permit, I'd like to add one question on another point. I am bothered, frankly, by the petitioner's argument under the Regulatory Flexibility Act. I really don't know how good your answer is. Can you just give me a word on that? Sure. Well, it's clear that the initial regulatory flexibility statement is not judicially reviewable. All that's reviewable is the final regulatory flexibility statement. The cases in which there have been remands on that basis, and again, those cases don't involve vacating, they involve remand, are cases in which an agency just dispensed with it altogether and didn't do it. Here, the Commission did it. The notice of proposed rulemaking was incorporated by reference into the initial Regulatory Flexibility Act statement, and the second reporting order, in turn, was incorporated by reference into the final Regulatory Flexibility Act statement. I would suggest that the regulatory flexibility argument and the notice argument really telescope. It's really the same argument. And the Commission then, on reconsideration, at some length, addressed the regulatory flexibility issue and certainly cured any problem that there was, even though I don't actually think there was a problem before. Thank you, counsel. We'll hear from Mr. Lake. Good morning, Your Honors. I'm William Lake, appearing for the intervenors CTIA and T-Mobile. CTIA is a trade association whose members include wireless carriers, manufacturers, and others who are interested in the wireless industry. Many of its carrier members are small and focus on serving rural and underserved areas. It's here on behalf of its entire membership. And T-Mobile is the smallest of the four national wireless carriers. Your former client, do they qualify as designated entities? T-Mobile is not a designated entity. CTIA has a number of very small members. Ten percent of its carrier members are classified as small telephone companies under different FCC regulations. Some of them have been designated entities in auctions. The reason I can't give you a number is that the Commission sets the designated entity threshold separately for each auction, so that it's more difficult to determine. But, yes, some of CTIA's members are and have been designated entities. We agree with the Commission that there was no defect in the process by which these rules were adopted. And what I'd like to do is to focus my time on the second proposition, which is that even if there were a defect in the process, that would provide no basis for either vacating the rules or overturning the auction results. Well, I guess one of the things that Judge Tashima brought up, and I guess I brought up as well, if we vacate, does that de facto unravel the auction, at least with respect to the unjust enrichment rule? Yes. It is very important that the auction not be overturned. And if there's any question in the Court's mind about that, I would like to talk about some of the consequences, if that were to happen. Well, maybe you could just answer my question. Just to answer that question, if the Court did say we are vacating the rules only prospectively, and we are not disturbing the results of the election, and only as to unjust enrichment, there would still be uncertainty. And I think under the governing rule, the rules should not be vacated. And the reason is we had a colloquy on a similar question at the stay proceeding, where the panel then asked what if they set aside the rules or stayed the rules and allowed the auction to go forward. This auction has now gone forward, but you would face the same question with the next auction, which is that these orders embody public interest determinations by the agency, that the old rules don't properly implement the statute, and that the public interest requires changes in the rules, and that these revised rules should be applied to future auctions. Now, if these Court rules… Do you know when the next auction is? I'm sorry to interrupt you, but… Yes, the next auction is required to take place under a federal statute by January 2008. This is a major auction of 60 megahertz of additional spectrum, and there's a statute that requires that it take place by January 2008. So we would have a situation in which if the agency were not allowed to apply these rules to that auction, it's not at all clear that it could apply the old rules to the auction, because if it did, they would almost certainly face litigation from different parties who prefer the new rules and who would throw into the Commission's face its own public interest determination that the old rules weren't sufficient. Would it be sufficiently different if we, just hypothetically, if we didn't agree with what happened with respect to the unjust enrichment rule and remanded it? What would be the net effect versus vacating? The effect would be… You would still throw it up in the air, right? If the problem were noticed, the Commission would almost certainly hold, hopefully a very prompt proceeding, to give notice and say, let us hear your comments on this. Hopefully they would have that finished before the next auction. But what we would avoid would be the uncertainty of having the rules placed in limbo or reverting to the old rules for some intermediate period of time, only to have the new rules put back in place. And this is what the case law, which we reviewed on pages 35 and 37 of our brief, establishes a proposition that courts do not vacate rules where it's clear that the agency could justify reimposing the same rules after remand and where vacating the rules would be disruptive. And I would just like to mention that I discovered… You see, now, I think you hit upon my problem right there. In other words, it seems to me it would be fair, even if we had some disagreement with the rules, it would be fair not to vacate the results of the auction only if there's at least a substantial possibility that the Commission could, in the future proceeding, justify maintaining the same rules, right? Yes, I think that's clear in this case, Your Honor. But if we don't see that the same rules could be maintained, then I think we should vacate the auction result. There is still an equitable discretion in the choice of remedy. And I think even in those circumstances, the consequences of overturning this auction would be so massive that the court should exercise its discretion not to overturn this auction. There's no way to know that the results of this auction might not have been exactly the same if the unjust enrichment rule had been somewhat different. And if I could turn to that, I would just… We'll give him another minute. I'd like to point out that this is the first major infusion of spectrum for this industry in 10 years. Over 150 companies participated actively in the auction. Over 100 companies won licenses in the auction. And more than half of those are designated entities. Many of the auction owners are ongoing businesses that have millions of customers  And this service is called the Advanced Wireless Services Auction. This spectrum is particularly important for the introduction of third-generation services, which are broadband services that will allow a customer to access the Internet or download large files such as video and music. And we have an amethyst brief here from a group of small rural designated entities. These are small carriers, most of whom are designated entities, making clear how badly they need this spectrum in order to improve service in rural and remote areas and how much they would be harmed if the auction results were overthrown. Under these circumstances, I think the Court should exercise its equitable discretion not to overturn this auction and turn the industry upside down, even if it had any doubt, which I don't think there should be, that these same rules could be adopted on a remand. Thank you, counsel. Some quick bullet points, and then we'll get to the remedy. But on jurisdiction, the Court, the panel, found jurisdiction not under all writs, as the Commission said they could find it. They found it under the governing statutes under 2342. So that's the rule of this case and not the All Writs Act. So look at the panel's decision on that. You've been talking about undoing the unjust enrichment rule. I can't emphasize enough that both rules suffer from the same defects. Ask yourself this question when you review the record. Wholesaling, which is subject to 50% restrictions, is nowhere even defined in this record. This record is so bad you can't even find a definition. You don't even know what it is. You have no balance of policy justifications for regulating wholesaling, which is a facilities-based model. In wholesaling, the DE builds the facilities, and all the pro-competitive benefits flow from building the facilities. This is not warehousing the spectrum, not using it. But in this record, you can't uphold this rule because they just threw it in there without defining it and without giving you any basis for determining its rationality, the policy pros and cons. It has to go. On 309J, the express language of that statute is at the heart of this case. I would point you particularly to 309J4E. The Commission shall, in line with the words that are very important here, the Commission shall, it's mandatory, ensure, a strong word, no doubt, that small businesses are given the opportunity, again, to participate in the provision of spectrum-based services. What I would respectfully suggest to the Court is what the agency did here had the exact opposite effect of that. Instead of ensuring it, instead of being proactive and helping small businesses, it dropped those pianos on their head and made it very difficult for them to participate at the last minute. How many DEs were successful in Auction 66? Fifty-seven, of which 40 were small rural companies. Doesn't that undermine what you just said? No, it does not. What you just said, I would expect to see 0, 2, 5, 8. That's a pretty large number, isn't it? The trend line isn't good, Your Honor. In Auction 69, the next auction held, if you had one more cent, 0%. The trend line is not good. It's tending toward the flat line. At least in Auction 66, there obviously were enough. The rural companies, of which that was 40 of those 57, have a whole different business model. They're not as dependent on access to capital because they're docking existing businesses, which are very small. They don't have that same problem. But if the point is to help small operators, are you saying the rurals don't qualify as small operators? No, they can't. And rurals are also to be helped. What I'm saying to this Court is that there's no evidence in this record that investors were not troubled by this. There is plenty of evidence that investors were harmed and didn't flee for the exits. Council tree is a case in point. Council tree is a case in point. I want to get to... They said that MMTC, one of the petitioners here, had said that you should adopt the 10-year rule. If you read specifically what MMTC said in one isolated comment was the FCC should consider initiating a rulemaking. That, by its very nature, illustrates the nature of the problem. The rulemaking that was teed up didn't allow for that. They asked the Commission to consider initiating a rulemaking. They didn't say anything that they were empowered to adopt a 10-year rule under this rulemaking, or that they should. They didn't recommend any such thing. They'd like to pick out snippets from the further notice. Again, I just urge you to read them in context. 13 or 14 times do they repeat the two targeted proposals in that further notice. And they're trying to pull out snippets like, such as, or in some other manner. They're all read in context of the rulemaking about the targeted proposals. They did not tee up the designated ending rules, per se. And they know how to do that, because they've done that in the past. Look in 1997. As far as the remedy goes, we believe strongly that the action results are tied. It's a single action, and the action results should go. If the court wants an alternative remedy... Wouldn't it be really disruptive and expensive? Well, I can't say it wouldn't be disruptive, but the actions they took here were very disruptive to the small business community, is my view. And one way to look at it is, were the winners of this auction unjustly enriched themselves by getting to participate against a sharply reduced bidder pool? Were they unjustly enriched? And should you not get a more robust bidder pool back into this auction? With all the innovation that small businesses bring in, that's where the innovation comes from. Not from the larger governments. They're not all about innovation. The innovation comes from the small businesses. T-Mobile itself was once a DE. It's now T-Mobile. Maybe you could direct some comments to what we had questioned your adversary about, and that would be the unjust enrichment rule. I guess the issue that we had discussed with him would be vacate or remand. What is the harm if it's vacated? There's no harm. Does it unravel the auction? Not if you don't say so. Okay. I think we need to address that question, what I was getting at. But you need to vacate. The default, when notice and comment is defective, is to vacate. Because the rules were defective here, the defect is huge. It's massive. And therefore, you've got to vacate these rules. If you don't, we're going to auction the next 700 megahertz auction with the same rules in place, with the same harm. You've got to get rid of the rules. They have to be vacated. And that's the default under the law. It's only when there's a minor technical defect that can be easily remedied that you would not vacate and just simply remand. If we just remanded this agency, look how long they've taken to act on a recompetition. It's been a year to do a ministerial act. If they don't want to act, and it's not in their interest to act, they're not going to do it. You can't let that happen. You've got to vacate. Now, if you haven't won another remedy, and you conclude, despite my arguments, which I think are valid, that you've got to get rid of the auction result and redo this, there's no mulligan here for the community. It needs to get this auction. There's no mulligan on the remand. You've got to get this auction redone. But if you want another remedy, you say, look, you made this mess. We're vacating the rules. We're remanding it to you to fix it and see what they can come up with. That's probably the other way you can look at this. Put the pressure back on them. Put the mess back where it was, and say, you've got to come up with an effective remedy and maintain jurisdiction of this case and give us a clear pathway back. Don't let this go on, because these auctions are going off. The 700 megahertz is a huge auction of beachfront spectrum. These rules should not infect yet another auction. They're bad rules, improperly adopted. Please get rid of them. Thank you, counsel. Thank you very much. Thank you all, counsel, for your very helpful briefing and argument. Okay. We'll next hear the United States.